Argued October 17, 1944; reversed January 9, 1945

## LA FORGE *v.* ELLIS ET AL.

(154 P. (2d) 844)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Harry G. Hoy,* of Portland (Hoy & Prag, of Portland, on the brief), for appellant.

*Rex Kimmell,* Assistant Attorney General, and *Wallace McCamant,* of Portland (George Neuner, Attorney General, on the brief), for respondents.

LUSK, J. This proceeding was brought under the declaratory judgment statute to obtain a decree declaring that Chapter 330, Oregon Laws 1943, is unconstitutional and void, and enjoining the enforcement by the defendants of the provisions of the act and of a certain order made by the defendants fixing minimum prices for barber services in Multnomah county. From a decree in favor of the defendants, the members of

the Board of Barber Examiners and the attorney general of this state, the plaintiff has appealed.

The pleadings disclose a justiciable controversy, and, if the statute be unconstitutional as averred, the right to the injunction prayed for.

The challenged act is an attempt to fix by law minimum prices for barber services. Section 1 is a declaration of legislative policy, which recites in substance that the fixing of minimum prices for barber service will tend to protect the health and safety of the public, and that unfair, demoralizing and uneconomic competition and practices now exist in this state among barbers and barber shops, resulting in price cutting to the extent of preventing barbers from rendering safe and healthful service to the public by reducing their purchasing power in obtaining sanitary products and appliances required for health, protection and safety in preventing transmission of disease. Sections 3 and 4 are as follows:

"Section 3. Whenever a scale of minimum prices for barber services shall have been agreed upon, signed and submitted to the board of barber examiners by at least 70 per cent of the licensed barbers in any county of this state, the board of barber examiners shall have power to approve such agreements and to declare and establish, for such county, by official order, the minimum prices for any and all work or service usually performed in barber shops. Before approving such agreements the board, within 30 days after such schedule is submitted, shall determine by investigation whether such suggested prices are reasonable and sufficient to enable barber shops in such district to operate in keeping with the purposes of this act in minimizing danger to the public health and safety incident to such work. In determining reasonable minimum

prices the board shall take into consideration the necessary costs incurred in such district in maintaining' barber shops in a clean, healthful and sanitary condition, and also the wages or commissions, or both, which customarily are paid to employes in barber shops in such district and shall take into consideration any and all other facts and conditions affecting the barber profession in its relation to the public health and safety.

"Section 4. All orders of the board approving schedules of prices to be charged for barber service shall remain in force and effect for a period of one year after the date of the approval of any such order, and shall be renewed annually upon its anniversary date, unless rescinded, modified or replaced by a new agreement, approved and promulgated by the board, after being signed and submitted under the procedure provided in section 3 of this act."

The remaining sections of the act provide in detail for the administration of its provisions by the board, and authorize the board to refuse to grant a barber's license or to suspend a license already granted for any violation of the act. Judicial review of the board's decisions in this regard is provided for.

The plaintiff, a licensed barber of this state, charges that the act contravenes the due process clause of the Fourteenth Amendment of the Constitution of the United States and is an unlawful delegation of legislative authority in violation of Art. IV, § 1, Art. III, § 1, and Art. I, § 21, of the Constitution of Oregon.

By invoking the Fourteenth Amendment the plaintiff has raised the important question whether a law requiring barbers to charge minimum prices for their services is an arbitrary interference with the right of the individual to pursue a lawful calling, or is sustain-

able as an exercise of the state's police power on behalf of the public health and welfare. Elsewhere the decisions are in conflict. Similar legislation has been adjudged constitutional in the following cases: *McRae v. Robbins,* 151 Fla. 109, 9 So. (2d). 284; *Board of Barber Examiners v. Parker,* 190 La. 214, 266, 182 So. 485, 502; *Herrin v. Arnold,* 183 Okla. 392, 82 P. (2d) 977, 119 A. L. R. 1471; *Ex parte Herrin,* 67 Okla. Cr. 104, 93 P. (2d) 21; *Arnold v. Board of Barber Examiners,* 45 N. M. 57, 109 P. (2d) 779; *State v. McMasters,* 204 Minn. 438, 283 N. W. 767. To the contrary are: *City of Mobile v. Rouse,* 233 Ala. 622, 173 So. 266, 111 A. L. R. 349; *Noble v. Davis,* 204 Ark. 156, 161 S. W. (2d) 189; *In re Kazas,* 22 Cal. App. (2d) 161, 70 P. (2d) 962; *Duncan v. City of Des Moines,* 222 Iowa 218, 268 N. W. 547; *State Board of Barber Examiners v. Cloud,* 220 Ind. 552, 44 N. E. (2d) 972; *State v. Greeson,* 174 Tenn. 178, 124 S. W. (2d) 253.

But we do not reach the question of violation of the federal constitution, for we are clearly of the opinion that the statute must be held invalid as an attempt unlawfully to delegate legislative authority.

The case is governed by *Van Winkle v. Fred Meyer, Inc.,* 151 Or. 455, 49 P. (2d) 1140. We there held unconstitutional, as an attempt to make an unlawful delegation of legislative authority, a statute which empowered the governor to approve marketing agreements entered into by persons representing a substantial majority of the volume, measured in dollars or unit of output, of the intrastate business within this state of a particular industry or subdivision thereof, and declaring that the provisions of any agreement so approved should constitute the legal standards of fair competition and fair trade practices for the industry

covered by the agreement. The legislation was held to be in conflict with Art. IV, § 1, of our constitution, under which the power to make and declare laws, subject only to the initiative and referendum powers reserved to the people, is vested exclusively in the legislative assembly; with Art. III, § 1, by which the powers of government are divided into three departments, namely: the legislative, the executive, including the administrative, and the judicial, and each of said departments is prohibited from exercising any of the powers conferred upon either of the others; and with Art. I, § 21, providing:

> "Nor shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this constitution; provided, that laws locating the capital of the state, locating county seats, and submitting town and corporate acts, and other local and special laws, may take effect or not, upon a vote of the electors interested."

The application of that precedent to this case is clearly shown by the following extract from the opinion:

> "Under the very terms of the act in question, there is to be no law fixing the price of any commodity or regulating its production or sale unless a preponderant majority engaged in its production or sale formulate an agreement and secure its approval by the governor. Under the specific directions of the act, when this has been done, the prices so fixed and the regulations so adopted are to become the law of the state, but if no agreement is entered into, then there is to be no law. This leaves wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be. It is impossible to conceive of a more

complete delegation of legislative power and, since the act contravenes the plain provisions of our constitution in that it attempts to make an unlawful and unauthorized delegation of legislative power, the act is unconstitutional and void.'' 151 Or. 463.

Referring specifically to Art. I, § 21, of the state constitution, it was said:

"It will be seen from a mere reading of the act that not only, as we have before stated, the question of whether there was to be a law and, if so, what the terms of the law were to be was to be determined not by the legislature but by an indefinite and indeterminate group of persons representing some particular line of the industry covered by the act but also that the question of when such a law was to go into effect was dependent wholly upon the initiative of persons outside the legislature.'' 151 Or. 270.

The opinion of the Supreme Court of Wisconsin in *Gibson Auto Co. v. Finnegan,* 217 Wis. 401, 259 N. W. 420, holding unconstitutional similar legislation of that state, was quoted from at some length. In that case the court said:

"Not only is the power to determine whether or not there shall be a law at all delegated to an indefinite class or group, but the governor and all other public officers are rendered powerless to act except upon the initiative of a preponderant majority of a group.'' 217 Wis. 408.

The Fred Meyer case is sought to be distinguished by the attorney general for the reason that, as it is said, the statute under consideration provides adequate standards for the guidance of the Board of Barber Examiners in adopting a scale of minimum prices, whereas the legislation involved in the Fred Meyer

case was wanting in such standards. This may be true, but the defect pointed to by counsel was but one of the grounds of decision in the Fred Meyer case, and a wholly independent ground was, as the language above quoted shows, that "the governor and all other public officers are rendered powerless to act except upon the initiative of a preponderant majority of a group."

It is urged, however, that the act should, if reasonably possible, be given a construction which would render it constitutional rather than unconstitutional, and that, under a reasonable construction, it means that the board is granted authority to fix schedules of minimum prices on its own initiative and without regard to schedules contained in agreements made by seventy per cent of the barbers of a county. Were this an admissible construction a different question would be presented, but, in our opinion, to give the statute the suggested meaning would not be to construe it, but to rewrite it. For it is only after a "scale of minimum prices" has been "agreed upon, signed and submitted to the board of barber examiners" by seventy per cent of the licensed barbers in the county that the board is authorized to act at all. The board may then, after investigation and consideration, "approve such agreements" and "declare and establish * * * the minimum prices". But if it should fail to approve an agreement it is not granted authority to establish a different scale of prices which it might find to be "reasonable and sufficient". There its authority ceases, and, unless and until seventy per cent of the licensed barbers of the county submit another agreement containing a scale of minimum prices which the board finds to be "reasonable and sufficient", the price of barbers' services remains unregulated and every barber is free to

charge the price he chooses whether it be "reasonable and sufficient" or otherwise.

The correctness of this construction becomes the more evident from an examination of § 4, which provides that all orders of the board approving price schedules shall remain in effect for a period of one year after the date of the approval of any such order, "and shall be renewed annually upon its anniversary date unless rescinded, modified or replaced by *a new agreement, approved and promulgated by the board, after being signed and submitted under the procedure provided in § 3 of this act*" (italics added). Thus, it is seventy per cent of the licensed barbers of the county, not the board, which determines whether or not a price schedule shall continue effective for more than one year, and, even though a price schedule in effect had, due to a change in conditions, become unreasonable and insufficient, and the board should so find, it would be powerless to terminate, suspend or modify the schedule, and seventy per cent of the registered barbers in the county could keep those prices in effect by simply refraining from doing anything.

It seems to us, therefore, to be manifest that by this enactment the legislature has attempted to do the very thing that we said in the Fred Meyer case could not constitutionally be done. The attempted delegation of authority here differs from that in the statute of Oklahoma sustained in *Herrin v. Arnold,* supra, and in the statute of New Mexico sustained in *Arnold v. Board of Barber Examiners,* supra. In the former case the court said that "the board may act with or without the submission of an agreement", and in the latter, that the board was granted "authority to 'vary or refix' from time to time a minimum price". Under

the Oregon act, the board must either take what is offered by ''a preponderant majority of a group'' or do nothing.

Counsel for the defendants call to our attention the California cases of *Jersey Maid Milk Products Co., Inc. v. Brock,* 13 Cal. (2d) 620, 91 P. (2d) 577, and *Agricultural Prorate Commission v. Superior Court,* 5 Cal. (2d) 550, 55 P. (2d) 495, in which the Fred Meyer case was discussed. To these may be added *Brock v. Superior Court,* 9 Cal. (2d) 291, 71 P. (2d) 209, 114 A. L. R. 127. Counsel say in their brief:

''The California Supreme Court seems to regard the Meyer case as going to the limit of what the law can be said to approve.''

In the cited cases, acts regulating the production and marketing of agricultural products and containing provisions for the approval of regulations by persons affected were sustained. The Fred Meyer case was distinguished on various grounds. In *Brock v. Superior Court,* supra, the court said that that case and *Gibson Auto Co. v. Finnegan,* supra, were ''decided on the theory that the power to *initiate* the legislation establishing rules of fair competition had been delegated to private persons, a majority of a trade or industry'', and for that reason were ''readily distinguishable''. We find in the California decisions no language of express disapproval of our decision in the Fred Meyer case, but, apart from that, we are satisfied of the soundness of the doctrine of that case with respect to the point under consideration. Its essential principle may be found enunciated and applied in *State v. Hines,* 94 Or. 607, 615, 186 P. 420, and *Portland v. Coffey,* 67 Or. 507, 513, 135 P. 358.

*Savage v. Martin,* 161 Or. 660, 701, 91 P. (2d) 273, and other like cases relied on by the defendants are not in point, for they deal with enactments under which boards or commissions, duly created by the legislature and guided and confined in their action by definite and adequate legislative standards, were delegated power to do no more than "to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Locke's Appeal,* 72 Pa. 491, 13 Am. Rep. 716.

For the foregoing reasons we are of the opinion that the challenged act is unconstitutional and void, and a decree to that effect and enjoining the enforcement of the provisions of the act and of the minimum price order heretofore made by the defendants pursuant thereto will be entered herein.

The decree of the circuit court is reversed.